(33 Misc. Rep. 337.)

McGUIRE et al. v. BLOOMINGDALE et al.

(Supreme Court, Special Term, New York County. December, 1900.)

NUISANCE—INJUNCTION—EVIDENCE—SUFFICIENCY.
    Plaintiff claimed that the noise and vibration caused by blowers which were a part of a pneumatic system of cash carriers in defendant's store, adjoining plaintiff's premises, was a nuisance. One of plaintiff's tenants testified that the premises rocked like a boat in rough weather; and a neighbor, that the sounds were like a small earthquake. Some

testified that there was no vibration in the main part of the plaintiff's house, but a little in the rear; some, that the noise was extremely annoying; others, that it was scarcely noticeable when the windows were closed. One of plaintiff's witnesses, who had been defeated in a lawsuit by defendant, testified that he felt no vibration in plaintiff's house; and a witness who testified to a loud noise and great vibration was shown to have been discharged by defendant, and to have previously made an affidavit to the contrary. Numerous employés of defendant testified that there was no perceptible noise or vibration in the store, and former tenants of plaintiff's premises stated that there was no vibration or disturbing noise. Plaintiff's premises were within a few doors of a street where a cable and an elevated railroad were operated, and on a busy thoroughfare. *Held*, that the evidence was insufficient to warrant the granting of an injunction.

Suit by Catharine McGuire and others, executors of Joseph McGuire, deceased, against Lyman G. Bloomingdale and others. Decree in favor of defendants.

Julius H. Seymour, for plaintiffs.
Horwitz & Samuels, for defendants.

ANDREWS, J. This action was commenced on April 25, 1894, in the court of common pleas by the late Joseph McGuire. The complaint alleged that the plaintiff was the owner of the premises No. 160 East Sixtieth street, and that the defendants were co-partners doing business on their premises, located at Third avenue and Fifty-Ninth and Sixtieth streets; that the defendants had placed on their premises an extensive electrical plant, with boilers, engines, and dynamos for the production of electric light, and also pneumatic blowers; that the said blowers, engines, and machinery caused so much vibration and noise in the premises of the plaintiff as to render them unfit for habitation; and that the defendants were in the frequent habit of loading and unloading wagons on the sidewalk in front of the premises of the plaintiff, thereby creating a nuisance. The relief asked for was that the defendants should be enjoined from running the pneumatic blowers and electric light engines and machinery so as to cause vibration and noise on the premises of the plaintiff, and from loading and unloading wagons on the sidewalk in front of the plaintiff's premises. Application was made by the plaintiff for a preliminary injunction. Voluminous affidavits were submitted on both sides, and full argument was had, but the application for an injunction was denied. In October, 1894, the original plaintiff died, and his executors were subsequently substituted as plaintiffs. The action was noticed for trial by both sides, and was frequently on the day calendar of the court of common pleas and of the supreme court, but was not brought to trial for a long time. In April, 1899, a motion was made for leave to serve an amended and supplemental complaint, which motion was granted so far as it asked leave for the plaintiff to set up the substitution of the present plaintiffs, and otherwise was denied. A second motion was afterwards made for leave to serve an amended complaint which should allege the pecuniary damages sustained by the plaintiffs. This motion was denied on the ground of laches in making the application. A trial

was finally had in April, 1900, but no evidence was offered to sustain the allegations of the complaint in regard to the noise and vibration caused by the defendants' electrical plant. The defendants are the proprietors of a large department store, in which about 2,000 people are employed. Their premises cover the entire westerly side of Third avenue between Fifty-Ninth and Sixtieth streets, and extend 195 feet westwardly from Third avenue on Fifty-Ninth street, and to a point 125 feet easterly from Lexington avenue. The premises on Third avenue and Fifty-Ninth and Sixtieth streets consist of a building six stories high. The front of the premises immediately adjoining the plaintiffs' premises are Nos. 162 and 164 East Sixtieth street, which still retain the outward appearance of four-story private brownstone dwellings. The plaintiffs' premises are a four-story building 20 feet in width on a lot 100 feet deep. The building, which is over 30 years old, was purchased by the plaintiffs' testator in 1890, at which time it was a private house 50 feet deep. It was altered by him by the addition of an extension in the rear of 35 feet, and was then changed from a private dwelling to an apartment house. Prior to such alteration the defendants had purchased the buildings Nos. 162 and 164 East Sixtieth street, and were using them for commercial purposes. Shortly after plaintiffs' testator had completed such extension the defendants extended the buildings Nos. 162 and 164 East Sixtieth street to the rear line of their lot; the rear wall of No. 162 East Sixtieth street extending 15 feet deeper than plaintiffs' premises, and being about 3 feet higher. A short time after this extension had been built, plaintiffs' testator placed four large iron shutters on his building, which shut off the light and air from the four windows of such extension. All the machinery used by the defendants is in the basement and subcellar of their Fifty-Ninth street building. The pneumatic tube system for the transmission of cash carriers through defendants' establishment is one which is in common use in department stores, hotels, and other large buildings. It is operated by two machines known as "blowers," which contain fans with four blades, which by their revolution cause an alternate compression of the air, and a consequent vacuum, which transmits the cash carriers from what are known as stations, about 196 in number, to a central station. After the air has been used for this purpose it is exhausted from the blowers in two separate pipes, 26 inches in diameter, to one large pipe, 30 inches in diameter, which runs through the wall of defendants' building into the bottom of a brick chimney constructed outside of such building in an area adjacent to the rear of No. 162 East Sixtieth street. The air is discharged through this brick chimney into a galvanized iron pipe placed on top of the chimney, and issues from the mouth of that pipe into the open atmosphere at the height of about 125 feet from the ground. The distance between this brick chimney and the nearest point of plaintiffs' building is 10 feet 5 inches. The blowers themselves, and the various apparatus used in their operation, are of the very best kind obtainable, and in every respect first-class. The chimney is constructed in an area which is between the defendants' Fifty-Ninth street building and Nos. 162 and 164 East Sixtieth street. It is so built that one side rests

against the south end of the westerly wall of No. 162, which is alongside of the easterly wall of plaintiffs' building. These walls for a distance of some feet in the rear are independent, and the testimony is conflicting whether they actually touch one another, or whether there is a small space between them. The plaintiffs claim that the discharge of the air through the brick chimney causes it to vibrate, and that such vibration is communicated to the westerly wall of No. 162, and from there to the easterly wall of No. 160, causing a vibration of the plaintiffs' house. It is also claimed by the plaintiffs that the discharge of air through the chimney, and by the galvanized pipe into the open air above, causes a loud noise, which greatly disturbs the occupants of plaintiffs' house.

The trial of the action occupied five days, during which 61 witnesses were examined. The testimony is of the most conflicting character, and it is very difficult to determine from such testimony what the real facts are. Of course, the burden is upon the plaintiffs to establish their case by a fair preponderance of testimony, and the question to be determined is whether they have done so. A vast amount of testimony was taken in regard to the blowers, their manner of construction and mode of operation; in regard to the chimney and galvanized pipe on top of it, their mode of construction, and whether the passage of the air through the chimney and galvanized pipe caused them to vibrate; as to the propinquity of the independent walls between the plaintiffs' premises and No. 162 East Sixtieth street; as to whether the chimney caused the westerly wall of No. 162 to vibrate, and whether such vibration was communicated to the easterly wall of plaintiffs' premises; in regard to the iron shutters, and whether they were constructed by plaintiffs' testator merely for spite, or to prevent the employés of the defendants from throwing things from the defendants' windows when looking out of the same; and, generally, whether the operation of such blowers and the driving of the air through the chimney and galvanized pipe caused plaintiffs' building to vibrate, and also caused so loud and disagreeable a noise as to disturb the occupants of plaintiffs' building. A great many witnesses were called by the plaintiffs for the purpose of establishing that there were such vibration and noise, and that they were caused in the manner claimed by plaintiffs. These witnesses were the plaintiff himself; a number of persons who had been tenants in the plaintiff's premises at various times between the years 1893 and 1900; the plaintiff's janitress; two owners or occupants of property adjoining plaintiff's on the west; two pneumatic experts, Keane, Cavanagh, and one Freel, who had at different times been in the employ of the defendants; and Mr. Ford, a city surveyor. The testimony of these witnesses varied greatly as to the amount of vibration, and the character of the noise which they claimed was caused by the expulsion of the air through the chimney and pipe. One of the tenants, a Mrs. Rieger, testified that No. 160 East Sixtieth street rocked and vibrated just as a boat does when the water is rough, and one Schaefer, who lived at 156 East Sixtieth street, two doors from the plaintiff's premises, declared that the sound resembled a small-sized earthquake, while some of the other witnesses testified that there was no vibra-

tion in the plaintiff's premises in the main part of the house, but that there was some vibration in the rear of the extension, and some testified that the noise was so loud and disagreeable as to be extremely annoying, while others testified that even in the rear of the house the noise was scarcely noticeable when the windows were closed. Defendants' counsel, in his brief, makes the following general criticism of the testimony given by the tenants:

"A tenant who can hire an apartment for the same or cheaper rent in a purely residential portion of the city will naturally not take up his abode in contiguity to a commercial establishment; and especially is this true if the tenant is a person unaccustomed to city life, is of a nervous disposition, or of infirm or delicate health, or if his occupation renders him peculiarly susceptible to sounds. There was not a single tenant called by the plaintiff to testify to the noise and vibration in 160 East Sixtieth street who does not fall within one of these classes."

There is some force in this criticism, and also in the further criticism made by such counsel that the plaintiff failed to call as a witness any one of the present tenants of the house. One of the other witnesses called by the plaintiff was a Mr. Cook. It was shown that this gentleman was one of the defendants in a suit brought by the present defendants against the firm with which Mr. Cook was formerly connected, and in which suit the present defendants were successful. Mr. Cook was a very intelligent witness, and, after testifying that he visited the plaintiff's premises and stood in the rear room of the top floor, was asked, "Did you feel any vibration?" and he replied, "I won't say that I felt vibration,—trembling,—but I could hear this sound." He also stated that, in order to determine the nature of the sound, it was necessary for him to place the point of a lead pencil against the rear wall of plaintiff's premises, and to hold the other end in his teeth. He then went to the roof, and could not detect any pulsations in the brick flue itself until he had repeated his pencil test against the outside of the flue. According to this witness, the disturbance produced by the discharge of the air through the chimney and galvanized pipe was greatest at the point where it met the atmosphere at the mouth of the pipe, 125 feet from the ground. He was examined at great length, and, though called by the plaintiff, and having some apparent reason to be hostile to the defendants, the necessary conclusion from his testimony is that there is no jarring or vibration of the plaintiff's building itself, and that the only physical effect produced in the rear room of the top floor is the hearing of the sound, which could only be located by the pencil test which he described; and it seems to me that such testimony is much more reliable than the reckless and exaggerated statements of witnesses like Mrs. Rieger and Mr. Schaefer. Another witness called by the plaintiff was Mr. Cavanagh, who testified that there were a great vibration and loud noise. It appeared, however, that he had been discharged by the defendants on account of drunkenness, and that in 1894, while in the employ of the defendants, he had made an affidavit, to be used on the motion for a preliminary injunction, which contradicted his testimony upon the trial. In his affidavit, after describing the blower first installed, which exhausted in the cellar of the new building, then in process of construction, he said:

"When this blower was first constructed and erected in the defendants' premises, owing to the newness of the material, and owing to the fact that the roughness of the surfaces of the fans had not worn off, as it has done since, there may, perhaps, have been more noise than can now be heard; but this newness and roughness has entirely disappeared, and with it the noise it caused has also disappeared, leaving only the slight sound of the air discharged, that cannot possibly be heard in plaintiff's premises under any circumstances."

According to the testimony of all the witnesses, the noise produced by this first blower was much greater than that produced by the two blowers which were afterwards put in its place. Another former employé of the defendants (Keane) was called for the plaintiff, and testified that he visited the premises within a week of the trial in company with Cavanagh and two others of plaintiffs' witnesses and a lawyer's clerk. The most that he stated about the noise and vibration was that he heard the rear window in the rear room on each floor vibrate. He was asked, "Did you observe vibration on each floor?" and he answered, "If you refer to the windows, I did; yes." He also visited the roof with the others, and stated that, so far as he was concerned, the visit was negative in its results. To meet all this testimony of the plaintiff, the defendants called about an equally large number of witnesses. Some of these are persons who are in the present employ of the defendants, or carried on business in the defendants' departments. These were the superintendent, a dentist, florist, photographer, watchmaker, and persons who were in charge of the restaurant, and the book, picture, stationery, glassware, and ribbon departments. All these witnesses swear that there was no vibration and no noise perceptible in the defendants' building; and the dentist, photographer, and watchmaker also testified that they carried on their respective businesses daily, and that it would be impossible for them to do so if there was any vibration of the building; and the lady in charge of the extensive glassware department testified positively that there was no disturbance of the various wares which were for sale there. Some of the rooms occupied by these various departments were on the same side of the building as the chimney, but not in immediate proximity to it, while others were so located that the chimney, as constructed, came against and actually touched the building outside of them. Defendants also called as witnesses six persons who were at various times former tenants of the plaintiff's premises, and they all testified that there never was any vibration of the plaintiff's building, and that there was not enough noise to disturb them. Defendants also called as a witness Mr. Lorber, an architect, who testified that he had visited the defendants' premises at various periods from the actual construction of the building within 12 years, and of the different extensions, and had himself placed all the machinery in the building. He testified at length as to the arrangement of the machinery in the defendants' premises and stated that at the mouth of the galvanized iron pipe, leading upward from the top of the brick chimney, there was a general puffing sound, which was not very loud, and not at all an unusually loud sound. He also testified that the extension of the house No. 160, being plaintiffs' premises, has an independent wall, which is separated from an

inch to an inch and a half from the adjoining wall of the building No. 162 East Sixtieth street; that on the top story in the rear of No. 160 there was absolutely no vibration perceptible in the floor construction; that the fastener of one window sash was broken, and the sash was vibrating perceptibly; that no vibration of the walls was perceptible; that he put a wedge between the dividing sash to do the work of a proper sash fastener, and the vibration then wholly ceased. He testified that there was a slight vibration of the westerly wall of No. 162, but that it was in a longitudinal direction, and was not communicated, to any perceptible extent, to the easterly wall of No. 160; that when he was in No. 160 he could hear no noise if the windows were closed; that when he opened the window he could hear the puffing sound, which was not at all loud or of an unusual or extraordinary nature, nor was it so loud as to prevent a person who spoke in a whisper in that room from being clearly heard. He gave further testimony to the same effect. Mr. Barry, a real-estate expert, was called as a witness by the defendants, and testified that there was no vibration at all of plaintiffs' house. Mr. Gunning, another real-estate expert, was called by the defendants, and testified that he had visited the plaintiffs' premises; that there was no vibration whatever, nor could he hear any noise when the windows were closed, but when the windows were open in the rear he could hear a puffing sound. Mr. Pearsall, a mechanical and pneumatic engineer, testified that he had installed about 100 pneumatic tube systems, and described the operation of the system used in defendants' building. When asked as to the purpose which the chimney and galvanized pipe served, he said: "It confines the air in its course to the free atmosphere. It carries the air without allowing the pulsations to act on the atmosphere below the point of discharge." He also testified that the passage of the air through the chimney and pipe, and its discharge into the atmosphere, did not and could not cause such rocking and vibrating of plaintiffs' premises as was described by some of the plaintiffs' witnesses.

Of course, the testimony given by the present employés of the defendants is open to the criticism made by plaintiffs' counsel, that they would naturally testify, as far as they possibly could, in favor of their employers. No such criticism, however, can be made of the testimony given by former tenants of the plaintiffs' premises, and by other witnesses called for the defense. Where such conflict of testimony exists as in the present case, the court must, of course, consider what interest, if any, the various witnesses have which would tend to affect their testimony one way or the other; whether they are actuated by motives of revenge or by bias or prejudice; also, their intelligence, their manner of giving testimony, appearance on the stand, and means of knowledge or information. I have, with considerable labor and trouble, examined the voluminous testimony, and have made such allowance as I thought was proper by reason of the various considerations above mentioned, and my conclusions in regard to the whole matter are as follows: There is some slight vibration and noise in that part of the defendants' building where it is in immediate contact with the chimney. There is no vibration or noise whatever

in any other part of the defendants' building, attributable to the operation of the blowers, except in the cellar where they are located. There is no vibration whatever in plaintiffs' building. When the windows are closed, a very faint noise, which requires attentive listening to perceive it, can be heard in the rear of the extension of the plaintiffs' building. When the windows in that part of the building are open, the puffing noise, caused by the discharge of the air from the top of the galvanized pipe into the atmosphere, can be distinctly heard. This noise, however, is not of such a character that the court would be justified, under the decisions, in granting an injunction to restrain the operation of the defendants' blowers. "The test of the permissible use of one's own land is not whether the use or the act causes injury to his neighbor's property, or that the injury was the natural consequence, or that the act is in the nature of a nuisance, but the inquiry is, was the act or use a reasonable exercise of the dominion which the owner of property has by virtue of his ownership over his property, having regard to all interests affected, his own and those of his neighbors, and having in view, also, public policy? There are many illustrations in the books of the doctrine stated by the learned commentator [Blackstone] that the use of one's land for the purpose of a lawful trade may become a nuisance to his neighbor. But whether a particular act done upon or a particular use of one's own premises constitutes a violation of the obligations of vicinage would seem to depend upon the question whether such act or use was a reasonable exercise of the right of property, having regard to time, place, and circumstances. It is not everything in the nature of a nuisance which is prohibited. There are many acts which the owner of land may lawfully do, although it brings annoyance, discomfort, or injury to his neighbor, which are damnum absque injuria." Booth v. Railroad Co., 140 N. Y. 267–277, 35 N. E. 592, 24 L. R. A. 105. In Campbell v. Seaman, 63 N. Y. 577, the court says:

"Persons living in organized communities must suffer some damage, annoyance, and inconvenience from each other. For these they are compensated by all the advantages of civilized society. If one lives in the city, he must expect to suffer the dirt, smoke, noisome odors, noise, and confusion incident to city life."

In Bowden v. Illuminating Co., 29 Misc. Rep. 171, 60 N. Y. Supp. 835, it was held that there is no remedy for the annoyance and the injury caused by the use of machinery upon neighboring property, though it may injure plaintiff's property, if the use is reasonable, having due regard to all interests affected and the requirements of public policy. The court also said:

"In the strict sense, the use of machinery producing noise or vibration injures neighboring property. But to some extent such results must come to all who live in a busy, prosperous city. The hum and throb of mechanical life cannot be wholly confined to the walls of any structure. Hence the true test must be whether the use by the owner of the industry is reasonable, having due regard to all of the interests affected and the requirements of public policy."

Bookstaver, J., in denying the motion for a temporary injunction in this very case, said in part:

"Whether noise alone constitutes a nuisance depends upon circumstances. Trifling or occasional noises dependent upon the ordinary use of property, or in pursuance of an ordinary trade or calling, do not ordinarily constitute a nuisance, although those in the neighborhood are disturbed. The quality or character of the noise may be an important element in determining the question of nuisance or no nuisance. The fact that a certain person is annoyed is not to be taken into account, the average susceptibility being the test. The matter of locality has something to do with whether it is a nuisance or not. In the case under consideration the plaintiffs' premises are within a few doors of Third avenue, where the elevated railroad and cable railroad are in constant operation, and it is a notoriously busy thoroughfare, and the same is true of Fifty-Ninth and Sixtieth streets."

See, also, Riedeman v. Light Co. (Sup.) 67 N. Y. Supp. 391.

Upon the authority of these decisions, and many others which might be cited to the same effect, although the operation of the blowers does produce a puffing sound, which is plainly audible in the rear rooms of the extension to plaintiffs' building when the windows are open, I am of opinion that the use of the blowers, under all the circumstances of the case, is a reasonable one, and should not be enjoined by a court of equity. With regard to the allegation of the complaint that the defendants are in the frequent habit of loading and unloading their wagons on the sidewalk in front of the premises of the plaintiffs, and have continued daily to do so, and to litter up said sidewalk with hay, straw, and débris, and have thereby created a nuisance, the testimony also is conflicting; but I do not think the plaintiffs have sustained such allegations by a preponderance of evidence, and I am of opinion that the application for injunctive relief in that regard should also be denied. It follows from the views above expressed that the complaint must be dismissed, with costs.

Complaint dismissed, with costs.