Sidney A. Fine, J.
Plaintiffs — 75 in all, 74 having joined with plaintiff Pelletier at the trial — residents of Stuyvesant Town and Peter Cooper Village, sue to enjoin defendant’s operations during the early morning and late evening and night hours. *618 Repeatedly during the trial those who testified and their counsel disclaimed any desire to restrain the defendant’s activities during the normal working day, but claimed that the manner in which defendant conducts its business during the night and early morning constitutes a “ public nuisance They say they are disturbed and awakened by a series of noises, some sporadic and intermittent, some with greater regularity, and by dirt, soot and dust which find their way into' their apartments. Some found fault with noises created by the starting of motors of ready-mix trucks before 6:00 a.m. at defendant’s plant, by gunning of motors of trucks which stop for the red light at the corner of 20th Street and Avenue G and start up on change of light, others by the clanging of cables against the boom of a crane stationed on defendant’s dock and used to unload sand and gravel from scows moored alongside the dock or by banging of metal bars on the cement containers and on drums of the ready-mix trucks, or by the banging of the metal bucket of the crane on the concrete pavement, and still others referred to the noise of the revolving drum on the truck as it washes out at the end of the day’s work.
The dirt and dust came, say the plaintiffs, from bins, in which cement is temporarily stored before being deposited into defendant’s trucks and also in process of such deposit and by sand, blown from a belt conveyor, on which that material is carried to overhead bins, thence to be weighed into the ready-mix trucks.
Stuy ves ant Town and Peter Cooper Tillage were constructed in 1947. A few of the plaintiffs have lived in these developments since they were built and others have moved in more recently. These buildings are located between East 14th Street and East 23rd Street, and between the west side of Avenue 0 and First Avenue. The windows of some of the plaintiffs look out on the East River either directly facing east or obliquely from the north or south. Separating these buildings from the entrance of defendant’s plant is Avenue C, a street 200 feet in width, the center portion of which is occupied by the elevated portion of the East River Drive; the space directly below it is used as a public parking lot fully occupied. The street surface of Avenue G has a two-ear wide southbound lane and a similar northbound lane, each respectively to the side of the area occupied by the East River Drive.
The defendant has occupied its present location a.t 20th Street on the east side of Avenue C along the waterfront — concededly in an industrial zone — since 1938. Here it moved from 18th Street and the East River to make room for the East River Drive. It had been at the prior location for 10 years preceded by an *619 additional 10 years by a predecessor in the same line of business. It is not engaged in any manufacturing business. It maintains a plant consisting of two overhead hoppers for deposit of commercial coarse sand, gravel and stone and two hoppers for the deposit of cement. It unloads sand, gravel and stone from scows moored alongside its dock, by means of a crane and clam shell bucket at a fixed spot on the dock. These materials are stockpiled before being transported by a belt conveyor to the hoppers.
Cement comes in sealed, airtight metal containers and is unloaded by a noiseless dustproof method by means of compressed air through a hose attached to one valve on the container which blows the cement out of the container through another hose attached to another valve and thence into bins on the dock.
Sand and gravel or stone and cement are loaded into ready-mix concrete trucks. This type of truck has a drum mounted on a truck chassis. The materials are dropped from the upper hopper by gravity through a rubber hose called a boot, fitted into the truck hatch. The door on the hatch is clamped tight and is completely sealed so that no materials may escape while the drum is rotated. The loading of materials into defendant’s trucks creates no appreciable noise or dust. The rotation of the drum in the process of mixing the materials takes place, not at defendant’s plant, but at the construction jobs throughout the city, to which the material is delivered.
Because of the limited space on the dock — there is only a small storage capacity — continuous delivery and unloading of materials during the worldng day is necessary. At times, when particular urgent demands are made by construction needs, or by the type of building which depends on tides, such as dock building, or by emergencies such as breaks in water mains or other public utilities necessitating repairs or reconstruction, defendant does operate before 6:00 a.m. and after 8:00 p.m.
Unquestionably it was one of these unusual circumstances which focused the attention of plaintiff Pelletier and one of his neighbors on defendant’s late work and helped them enlist the others who joined them in this action. The Chase Manhattan Bank is erecting its new building downtown. Because of ground conditions and the demand that certain foundation structures be erected monolithically, concrete had to be supplied and poured continuously into the previously prepared forms. Accordingly deliveries were made on many days during the months of June and July, 1957 until 9:00, 10:00 and 11:00 p.m. and on two occasions until midnight. But at such times only one or two trucks were used for such late deliveries.
*620 Stuyvesant Town forbids the use of air conditioners and tenants keep their windows open on warm summer nights, and late operations could not but emphasize the noises that during the day mix with and are absorbed by other activities of defendant’s neighbors to its north and south on the waterfront, and by passenger auto traffic on the elevated highway and by buses, heavy duty trucks and trailers using the north and southbound Avenue C roads and by the southbound buses turning the comer of Avenue C and 20th Street to proceed westerly on East 20th Street. Each of the witnesses testified however, that there has been an appreciable diminution in these noises continuously since October, 1957, some testifying that they heard no noises since October, 1957 and others ascribing the failure to detect them to closed windows during winter months.
The injunctive remedy is an extraordinary one, which must be exercised with great caution and only when the right to it has been clearly and convincingly demonstrated. (Forstmann v. Joray Holding Co., 244 N. Y. 22, 29-30; McCann v. Chasm Power Co., 211 N. Y. 301, 306; Lyon v. Water Comrs. of Binghamton, 228 App. Div. 585, 590; 28 Am. Jur., Injunctions, p. 421.)
In Haber v. Paramount Ice Corp. (239 App. Div. 324, affd. 264 N. Y. 98) which was an action to restrain the operation of defendant’s business between the hburs of 9:00 p.m. and 6:00 a.m., so that the plaintiff and his family might not be disturbed by noises and vibrations which interfered with their sleep, an injunction was denied to the plaintiff, the learned Appellate Division saying at page 326: ‘ ‘ Whatever basis there is for the judgment for a permanent injunction must be found in the 1 actual physical discomfort and annoyance to plaintiff, and his immediate family, ’ preventing them ‘ from obtaining adequate sleep, ’ whereby they ‘ have become ill, and suffer from nervous exhaustion,’ for which no damages were asked.”
At page 327, the court continued: “ The general rule is that mere discomfort to persons living in adjacent property does not furnish a reason for forbidding the necessary use of one’s property conducted without negligence and with proper appliances, particularly when the property is located in the business and industrial section of a city.” (Citing cases.)
The defendant has been at its present location — also occupied by other industries —long before the houses in which plaintiffs reside were constructed and before they lived there. Incidentally and peculiarly enough, practically every one one who testified for plaintiffs professedly moved into the development without ever having examined the area and without the slightest knowledge of the existence of the various industries on the waterfront.
*621 Although the court is of the opinion that the conditions complained of are not of such nature as to furnish the basis for the granting of the stringent and drastic relief of injunction, nevertheless in the court’s desire to accomplish for the plaintiffs and all other residents of Stuyvesant Town and Peter Cooper Village similarly situated, as great relief as might be practicable and obtainable, and to secure their comfort and peace of mind, the court conferred with counsel and the witnesses in an effort to ascertain ways and means to diminish, eliminate or correct objectionable noises and to curtail the dissemination of cement dust and sand. The defendant showed a co-operative spirit. As a result of the court’s efforts the defendant undertook and installed corrective measures which are more particularly hereinafter specified.
Almost all of the noises to which plaintiffs testified have been voluntarily eliminated, diminished or corrected by the defendant.
1. No longer does defendant permit its employees to strike the metal cement cylinder containers or the drums of the vehicles with metal bars. The metal bars were replaced by rubber mallets. For greater assurance against objectionable noise, defendant installed and is using a noiseless vibrator on the cement cylinder containers, in place of the rubber mallets.
2. Defendant disputed the charge that the bucket is permitted to fall on or strike the concrete pavement. I am satisfied from the evidence that this has not been done. Defendant says such practice would be damaging not only to the pavement but to the bucket itself, and that it is prohibited. Nevertheless defendant has instructed its engineer to see that this is not done. Surely it is not a necessary or desirable way of handling a piece of equipment.
3. Defendant has installed rubber rollers or shrouds between the steel of the boom and the cables, so that instead of a slack cable hitting against the metal frame of the boom, it will hit the rubber. Furthermore, to remove any possible objectionable noise, the defendant has attached three rubber tires to the boom. I am satisfied and find that as a result of these improvements there is no noise of metal hitting against metal.
4. The truck gunning its motor at the intersection of 20th Street and Avenue 0 now proceeds along Second Avenue to 14th Street, thence to Avenue 0 and in a northerly direction on the easterly roadway of Avenue 0 to defendant’s plant. On the last day of the trial, at the court’s suggestion, the defendant’s vice-president stated that its trucks will use this alternate route, of going dowm Second Avenue instead of the west side of Avenue C, in the hours before 7:00 a.m. and after 7:00 p.m. Subsequently *622 and during the court’s visit to the area accompanied by counsel and representatives of the parties herein, the defendant agreed to use said alternate route before 7:30 a.m. and after 7:00 p.m. on weekdays and before 9:00 a.m. and after 7:00 p.m. if trucks are operated on Saturdays, Sundays or holidays.
5. The court finds no unnecessary or unusual noise when trucks, six or less in number, after 6:00 a.m. start their motors. They create no greater noise than the start of the usual truck motors.
6. The court finds no discernible noise of any consequence while the truck washes out at the end of the day.
7. The isolated instance in 1956 of' the use of a gasoline motor when a compressor broke down, and which has not been repeated, requires no further mention.
8. As far as dirt, dust and soot are concerned, the court finds that no dirt or soot comes from defendant’s operation. Soot emanates either from the power plants north and south of the development or from craft plying the river. Dust is an inseparable part of the industrial life of our city.
While the defendant disputed that cement or cement dust escaped into the air or into plaintiffs ’ apartments, the defendant nevertheless, in order to eliminate the possibility of the escape of cement dust, constructed and installed on each of the cement bins a sealed metal box two and a half feet square and three and a half feet high with a sealed door on top and between the two sealed boxes has installed a Pangborn Dust Collector which completely eliminated the possibility of cement dust escaping. A third bin, which the court observed, will, according to defendant be similarly connected when put in operation.
The sand delivered to defendant’s plant is a coarse sand moistened as a result of being washed, after excavation at the sand banks, to remove organic substances. Approximately 5% moisture is in the sand on its arrival and removal from the scows at defendant’s plant. There is little probability that the sand is blown around or reaches the homes of these plaintiffs.
The defendant’s business is a lawful one, and is not a public nuisance, and defendant has a right to carry it on. Work done after 9:00 p.m. is sporadic — rarely is any operation conducted before 6:00 a.m. Sound tracks and movies taken by the defendant and sound tracks taken by plaintiff Pelletier clearly indicate a series of noises from buses, trucks and other vehicles and from normal street traffic traversing the highway adjacent to plaintiffs ’ residences, equal to if not greater in intensity and duration that any of the noise from defendant’s trucks, crane or its other operations.
*623 By consent of the parties, the court visited and inspected the defendant’s plant and observed its operations, observed the defendant’s industrial neighbors, visited and observed the neighborhood where plaintiffs reside and the surrounding areas and observed the traffic along the East River Drive and on the roadways of Avenue C. From the testimony adduced on the trial and from the court’s own inspection and observation, the court finds that the defendant has made all the changes and improvements above pointed out (which are not to be diminished or impaired) and that the noises of which plaintiffs complained, before the said changes and improvements were made, have been corrected. Such noises as still exist in the neighborhood are the usual normal workday incidents to industrial life of this city, and such as must be tolerated by all of us who wish to dwell in it. As was said by Eabl, J. in the early case of Campbell v. Seaman (63 N. Y. 568, 577): u Persons living in organized communities must suffer some damage, annoyance and inconvenience from each other. For these they are compensated by all the advantages of civilized society. If one lives in the city he must expect to suffer the dirt, smoke, noisome odors, noise and confusion incident to city life. As Lord Justice James beautifully said, in Salvin v. Northbrancepeth Coal Co. (9 Law R., Ch. Appeals, 705):1 If some picturesque haven opens its arms to invite the commerce of the world, it is not for this court to forbid the embrace, although the fruit of it should be the sights and sounds and smells of a common seaport and shipbuilding town which would drive the Dryads and their masters from their ancient solitudes. ’ ’ ’
In Bove v. Donner-Hanna Coke Corp. (236 App. Div. 37) the defendant operated a large coke oven plant which ran 24 hours in the day and 365 days in the year. The plant emitted a tremendous cloud of steam which escaped into the air, carrying with it minute portions of coke and gas with accompanying particles of dirt and dust which came from a large coal pile on the premises and the gases and an enormous accumulation of dirt and soot accumulated in plaintiff’s house preventing her from opening her windows. Plaintiff also claimed that she suffered severe headaches and that her health and that of her family was impaired, and claiming that the defendant’s use of its plant deprived her of the full enjoyment of her rights and constituted a private nuisance, sought to enjoin the defendant from the further maintenance of the nuisance. The court below denied the injunction and the Appellate Division affirmed, saying (pp. 39-40):
*624 1 ‘ While the law will not permit a person to be driven from his home, or to be compelled to live in it in positive distress or discomfort because of the use to which other property nearby has been put, it is not every annoyance connected with business which will be enjoined. Many a loss arises from acts or conditions which do not create a ground for legal redress. Damnum absque injuria is a familiar maxim. Factories, stores and mercantile establishments are essential to the prosperity of the nation. They necessarily invade our cities, and interfere more or less with the peace and tranquility of the neighborhood in which they are located.
“ One who chooses to live in the large centers of population cannot expect the quiet of the country. Congested centers are seldom free from smoke, odors and other pollution from houses, shops and factories, and one who moves into such a region cannot hope to find the pure air of the village or outlying district. A person who prefers the advantages of community life must expect to experience some of the resulting inconveniences. Residents of industrial centers must endure without redress a certain amount of annoyance and discomfiture which is incident to life in such a locality. Such inconvenience is of minor importance compared with the general good of the community.” (Citing cases.)
The evidence establishes operation by the defendant with the best and most modern equipment and in conformity with usual custom and proper practices. Effect must also be given to the fact that defendant’s plant was in operation prior to the construction and occupation of the two developments and to the character of the neighborhood. (People v. Accurate Brass Co., 271 App. Div. 1031; Bove v. Donner-Hanna Coke Corp., supra.)
The court has read the cases cited by plaintiffs ’ counsel. None of these cases are in conflict with the principles enunciated in the cases cited by the court above. In cases of this nature, the decision must depend on the facts appearing in the particular case. As was said in Andrews v. Perry (127 Misc. 320, 323), cited by plaintiffs: 11 There is no hard and fast rule as to just what constitutes a nuisance. Each case must depend upon the peculiar circumstances and surroundings which are present, the nature of the business, and the kind and extent of the annoyance. Whether the things complained of constitute a nuisance or not is a question of fact to be decided on the evidence in each case. (Roscoe Lbr. Co. v. Standard Silica Co., 62 App. Div. 421.) ”
Again, in Frank v. Cossitt Cement Prods. (197 Misc. 670, 671-672), cited by plaintiffs, the court said: “ Whether the use of *625 property to carry on a lawful business which creates smoke, noxious gases, noise, or which is offensive to neighbors, amounts to a nuisance depends upon the facts of each particular case.”
This being an action in equity, I must decide the case on the facts and conditions existing at the close of the trial and administer such relief as the exigencies of the case then demand. (Bloomquist v. Farson, 222 N. Y. 375, 380; Rosenberg v. Haggerty, 189 N. Y. 481, 485.) The exigencies of the ease at the close of the trial do not demand or even furnish the basis for the granting of an injunction. Accordingly I find judgment for the defendant dismissing the complaint. This is the decision of the court in accordance with section 440 of the Civil Practice Act.
Settle judgment on notice.